*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PRISMATIC FOUNDATION,

Plaintiff/Counterdefendant-
Appellant/Cross-Appellee,

v

ELIOT STREET, LLC, WOODWARD MACK 22,
LLC, and WOODWARD ELIOT, LLC,

Defendants/Counterplaintiffs-
Appellees,

and

SEC WOODWARD ELIOT, LLC,

Defendant/Counterplaintiff-
Appellee/Cross-Appellant.

UNPUBLISHED
September 28, 2023

No. 360450
Wayne Circuit Court
LC No. 20-012822-CB

Before: LETICA, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

In this dispute primarily involving questions related to an easement for parking arising out of either an express agreement, by prescription, or via a plat subdivision, plaintiff, Prismatic Foundation, appeals by right the trial court order granting in part and denying in part defendants', Eliot Street, LLC's, Woodward Mack 22, LLC's, SEC Woodward Eliot, LLC's, and Woodward Eliot, LLC's,[1] motion for summary disposition under MCR 2.116(C)(10). Specifically, the trial court found that there was no genuine issue of material fact that plaintiff was not entitled to an easement for parking, plaintiff only possessed an easement for ingress and egress over Eliot Street between Woodward Avenue and John R, and defendants Eliot Street, Mack 22, and Woodward

---

[1] Defendants are referred to collectively as "defendants" or individually as "defendant Eliot Street," "defendant Mack 22," "defendant SEC," and "defendant Woodward Eliot."

-1-

Eliot possessed an easement for ingress and egress over a portion of plaintiff's property. Defendant SEC cross-appeals this same order with respect to the court's ruling that plaintiff has an easement for ingress and egress over Eliot Street between Woodward Avenue and John R. Additionally, plaintiff challenges the trial court's earlier order granting partial summary disposition under MCR 2.116(C)(10) in favor of defendants on the basis that plaintiff did not possess a prescriptive easement for parking. We conclude the circuit court did not err by finding that: (1) no express easement nor any prescriptive easement granted plaintiff parking rights; (2) defendants Eliot Street, Mack 22, and Woodward Eliot hold an easement over a portion of plaintiff's property; (3) defendants' easement for ingress and egress over the disputed property was not abandoned; and (4) plaintiff is not entitled to attorney fees and costs under MCL 565.108. However, the circuit court erred by finding that plaintiff did not have an easement for parking arising out of the applicable plat and that plaintiff's easement extended from Woodward Avenue through John R. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

## I. BASIC FACTS AND PROCEDURAL HISTORY

The property at the center of this dispute is Lot 17 of a platted subdivision, "Brush Subdivision of Part of Park Lots 17, 18, 19, 20, 27 and Part of Brush Farm Adjoining," located in Detroit, Michigan. In 1884, a plat map of this name depicting this subdivision was filed that subdivided park Lots 17 through 21 and part of the adjoining Brush Farm east of these lots (hereinafter, "1884 Plat" or "Brush Farm"). Lot 17 fronts the south side of Eliot Street and is the middle of seven lots situated between an alley to the west and John R to the east, both of which run perpendicular to Eliot Street. Eliot Street is shown as 60 feet wide on the 1884 Plat and it runs all the way from Woodward Avenue on the west to Braun Street on the east. The plat also includes language dedicating the streets and alleys "to the perpetual use of the public." The following is a portion of the 1884 Plat, with Lot 17 and Eliot Street highlighted:



In the 1890s, a residence was constructed on Lot 17. In 1926, the owner of the residence died and bequeathed fee title to the property to the University of Michigan (the University), subject to the requirement that the Prismatic Club (hereinafter, "Club") be granted use of the property for its monthly Saturday night meetings. Since that time, the residence has been continually used as plaintiff's clubhouse.[2] Later, in 1961, the University entered into an agreement under which the Club assumed management of the property, including the authority to exercise the powers of ownership on behalf of the University. In the decades since plaintiff began using the residence, substantial changes to the surrounding area occurred, with many lots becoming vacant or converted into parking or commercial buildings.

By 1992, the American Red Cross had acquired multiple lots in the subdivision with the intent to construct a laboratory and create a closed, campus-like setting. To achieve this purpose, the Red Cross sought to vacate Eliot Street between Woodward Avenue and John R, i.e., including the block of Eliot Street that Lot 17 abutted, making the street inaccessible to the public. In turn, the site plan included a landscaped walkway around the clubhouse and also a large parking lot immediately west of the clubhouse; in effect, the clubhouse would have no direct access to a public

---

[2] The property was originally owned and occupied by Levi Barbour, who was a regent of the University of Michigan and member of the Prismatic Club. In 2014, the Prismatic Club formed plaintiff, i.e., the Prismatic Foundation, a 501(c)(3) nonprofit organization.

street. The Red Cross sent a letter to the Club, seeking its support for the development, which included its preliminary site plan.

After extended negotiations, the Club eventually agreed to support the Red Cross's development, conditioned on the requirement, *inter alia*, that the Red Cross provide its members parking. In particular, the Club and the Red Cross entered into a letter agreement in October 1993 (hereinafter, "Development Agreement"), which provided the following with respect to parking:

> 11. Parking for the caretaker will be needed, on an exclusive basis; two spaces should suffice. The most convenient would be the two spaces nearest Eliot on the north and nearest the west of the Property. By the same token we shall need the use of at least twenty spaces on Saturday nights from October 1st until June 1st the following year between the hours of seven P.M. and eleven P.M. We occasionally use the club on Sunday but because of your schedules we see no problem. Implicit in the use of parking space is the right of ingress and egress to it from Woodward and/or Mack for the benefit of all persons lawfully approaching or leaving the Property.

The Development Agreement was signed by both Red Cross's senior principal officer and the Club's president and treasurer.

The Red Cross submitted the Development Agreement to the city of Detroit in support of its petition to vacate the portion of Eliot Street. Then, in a 1994 Resolution, the City Council granted the petition to vacate the portion of Eliot Street between Woodward Avenue and John R. While the Resolution referenced that the Red Cross had submitted the Development Agreement to the City Council, the Development Agreement was never recorded. The Resolution, however, was recorded in the records of the Wayne County Register of Deeds. By operation of law, when the portion of Eliot Street was vacated, title in one half the street up to its center line (30 feet) vested in the University of Michigan as owner of Lot 17, for the width of Lot 17 (50 feet). See MCL 560.227a(2).

After the Red Cross completed its development, the Club members began regularly using the Red Cross's parking lot unimpeded and traversed by foot from the parking lot along the concrete walkway to enter the Club. Members also sometimes drove their vehicles on the walkway in order to deliver supplies to the clubhouse or to exit the parking lot. Red Cross vehicles "often times" did the same, as none of the redevelopment on the Club's property prevented ingress and egress.

Decades later—and about a year after the Club incorporated to form plaintiff—defendant Mack 22, in December 2015, purchased the real property owned by the Red Cross for the purpose of redeveloping the area.[3] Of note, a portion of this property included lots platted in a separate plat dated from 1871, titled "Brush's Subdivision of Part of Park Lots 17, 18, 19, 20, 17" (hereinafter, "1871 Plat"), while the rest of the lots were located in the 1884 Plat. Regarding the

_____

[3] The covenant deed noted the Resolution as a permitted encumbrance, but no reference was made to the Development Agreement.

new development, defendants envisioned the creation of a hotel, office and retail spaces, restaurants, multifamily housing, as well as construction of a 580-space parking structure located at the same location as the Red Cross parking lot. Defendants also sought to reopen the portion of Eliot Street between Woodward Avenue and John R.

Defendants "broke ground" on the project in August 2019. Around the same time, defendant Mack 22 conveyed title to portions of the property to related companies for purposes of the development. In April 2018, defendant Mack 22 quitclaimed title to Lots 12 and 13 of the 1871 Plat to defendant SEC; in November 2019, defendant Mack 22 conveyed title to Lots 5, 6, 7, 12, 13, 14, 15, 16, and 17, and part of Lots 4 and 11, of the 1871 Plat and 1884 Plat to defendant Woodward Eliot; and, in November 2019, defendants Mack 22, SEC, and Woodward Eliot quitclaimed their interests in Eliot Street, *including the portion owned by plaintiff*, to defendant Eliot Street. Defendant Mack 22 retained several lots located within the 1884 Plat only.

During this period, plaintiff's members continued to use the surface parking lot. Defendants also shared their development plans with plaintiff and offered the University an easement for egress and ingress over Eliot Street. Early in the process, in March 2019, plaintiff informed defendants by letter that "the Red Cross promised our membership the use of parking spaces in the Campus area immediately adjacent to our property on those evenings when the Club held meetings." The letter further stated, "We hope that once your parking structure is completed . . . that you will be open to allowing our membership special parking privileges in the structure on those Saturday evenings between September and June[.]" Then, midway through negotiations, in June 2020, the University executed a covenant deed conveying the property, i.e., Lot 17 and its adjacent half of vacated Eliot Street, to plaintiff for $10,000. Defendants then continued negotiations with plaintiff, which continued to seek, in part, free parking in defendants' parking garage consistent with the terms of the Development Agreement. Defendants refused.

In September 2020, plaintiff filed a complaint seeking, in relevant part, to quiet title in Lot 17 with respect to the one-half portion of Eliot Street abutting Lot 17 that defendants had quitclaimed to defendant Eliot Street (Count II); and for a determination that plaintiff has perpetual easements for ingress and egress over defendants' property to Lot 17, as well as an easement for parking in defendants' parking structure, by virtue of its ownership of a lot within a platted subdivision, i.e., the 1884 Plat, or either expressly under the Development Agreement or via a prescriptive easement (Counts IV and V).[4] Defendants answered the complaint and filed a counterclaim, seeking, in part, a declaration that defendants retained rights to use the portion of Eliot Street abutting plaintiff's property by virtue of 1884 Plat, hereinafter the "disputed property"[5] (Count III of counterclaim).

---

[4] Of note, Count IV related solely to an easement for ingress and egress and Count V related solely to an easement for parking. The theories claiming a right to these easements raised under each count were the same: that plaintiff possessed easement rights either by virtue of the 1884 Plat, by express easement (the Development Agreement), or by prescription.

[5] More specifically, the disputed property is the width of Lot 17 (50 feet) and is 30 feet long, which is half the width of Eliot Street.

Just a month later, defendants filed a motion for partial summary disposition under MCR 2.116(C)(8) and (10), arguing that plaintiff had failed to state a claim or demonstrate a genuine issue of material fact that plaintiff had a prescriptive easement for parking in defendants' parking structure. In particular, defendants pointed out that the Club members' use was not "hostile" because they used the parking lot with permission of the Red Cross. Plaintiff countered that a prescriptive easement arises when there is use for the required period under an invalid express easement, for example, an easement that is not signed or recorded. In this matter, plaintiff contended, the Development Agreement, which was never recorded and under which Club members believed they had the right to parking, formed the basis for a prescriptive easement.

At a hearing on the motion, the circuit court denied the motion under MCR 2.116(C)(8). Addressing the motion under MCR 2.116(C)(10), the court noted that plaintiff's own evidence indicated that the use of parking was not hostile, but "that it was actually enjoyed, appreciated and that . . . the use was something that was permitted." After the hearing, the circuit court entered an order denying defendants' motion under MCR 2.116(C)(8) and granting it under MCR 2.116(C)(10), thereby dismissing without prejudice plaintiff's prescriptive easement claim for parking.

Defendants again moved for summary disposition of the remaining claims. With respect to Count III of their counterclaim, defendants asserted that an order should be entered declaring that defendants have an easement for ingress and egress over Eliot Street, including the disputed portion abutting Lot 17, by virtue of the 1884 Plat, given that plaintiff had not presented any evidence that the Red Cross intended to abandon the easement with respect to the disputed portion of Eliot Street. By the same token, defendants conceded that plaintiff has an easement for ingress and egress over the vacated Eliot Street, resolving Count IV of plaintiff's complaint (easement for ingress and egress). Defendants also admitted, under Count II of the complaint (quiet title), that the court should enter an order declaring plaintiff the sole title holder of the disputed portion of Eliot Street, subject to defendants' easement. Finally, with respect to Count V of the complaint (easement for parking), defendants noted that the circuit court had already dismissed this count as it pertained to plaintiff's theory of prescriptive easement. Defendants further argued, however, that the 1884 Plat did not grant plaintiff an easement for parking because parking on a public street is not a right. Defendants also asserted that the plain language of the Development Agreement failed to create an express easement for parking because the Agreement did not even contain the term "easement," and failed to describe the servient estate and whether the easement was appurtenant or gross. Further, defendants asserted that parol evidence could not be used to establish the existence of an easement, only the scope of an easement. Alternatively, defendants argued that even if an express easement existed, the Development Agreement did not apply against them because they were bona fide purchasers who took title relying on the public record and could not be bound by unrecorded intentions.

In response, plaintiff countered that defendants' contention that Count II (quiet title) was "moot" was incorrect because defendants had not agreed to the relief plaintiff sought. In particular, defendants had not agreed to entry of an order that plaintiff held fee title to the disputed portion of Eliot Street "free and clear of any claim or interest of any of the defendants." Plaintiff alleged that a cloud on its title existed because defendants had knowingly filed a false deed in 2019, which called into question the application of MCL 565.108. Plaintiff further argued that Count IV (easement for ingress/egress) of its complaint was also not "moot" because the scope of its

-6-

easement with respect to Eliot Street remained at issue. Relatedly, plaintiff argued that a genuine issue of material fact precluded the relief defendants sought with respect to Count III of the counterclaim. More specifically, plaintiff pointed out that a large part of the property that defendants acquired from the Red Cross was actually platted in a different subdivision plat map—the 1871 Plat—or not shown in the 1884 Plat, meaning that those lots owned by defendants in the 1871 Plat had no easement rights over Eliot Street. Consequently, because defendants' property did not abut the disputed property and was not part of the dominant estates shown in the 1884 Plat, questions of fact existed from which a jury could find that defendants did not have an easement in the disputed property arising out of the plat. Alternatively, plaintiff argued that any easement arising out of the 1884 Plat with respect to the disputed property was extinguished either by merger or abandonment. Finally, with respect to Count V (easement for parking), plaintiff argued that the 1884 Plat's dedication of the street for public use included the use of the street for parking, noting that Eliot Street had been used for parking before its vacation. Plaintiff alternatively argued that the Development Agreement created an express easement for parking and for ingress and egress on Eliot Street; in this regard, plaintiff argued that no particular words are necessary to create an easement, only that the parties' agreement reflects an intent to create an easement.

At the hearing on the motion, the trial court first found that Count V of the complaint, requesting an easement for parking by virtue of the 1884 Plat, should be dismissed. The court agreed with defendant that *Cleveland v Detroit*, 324 Mich 527; 37 NW2d 625 (1949), negated plaintiff's claim that the 1884 Plat created a "right" to park on Eliot Street and that, as a public dedication, the City had the right to determine how the road would be used. The trial court also dismissed Count IV and V of the complaint, with respect to the alternative theory that the Development Agreement created an express easement for ingress and egress and parking, and rejected the consideration of parol evidence.

Addressing Count III of the counterclaim and Count IV of the complaint regarding the parties respective ingress and egress rights arising under 1884 Plat, defendant SEC admitted that it did not own any property in the 1884 Plat and, thus, did not have any rights under the 1884 Plat to pursue for declaratory relief under Count III of the counterclaim. However, defendants posited that all other defendants owned property within the 1884 Plat and, thus, could pursue the claim that they had ingress and egress rights over the disputed property. Plaintiff then clarified that none of the lots in the 1871 Plat had any easement rights under the 1884 Plat, that defendant Eliot Street owned no lots in the 1884 Plat that would give it an easement over Eliot Street, and that none of defendants' properties (besides defendant Eliot Street) touched on the disputed property.[6]

Thereafter, the circuit court entered a written order consistent with "the reasons set forth on the record[.]" The court's rulings were as follows:

- The circuit court first granted defendants' motion to quiet title (Count II of the complaint) in favor of plaintiff as the "fee simple owner of the Prismatic Property, free

---

[6] The circuit court did not address Count II (quiet title) of plaintiff's complaint at the hearing or plaintiff's claim that defendants had abandoned their easement over the disputed property.

and clear of any right, title or interest of Defendants[,]" including title to the disputed property.

- With respect to Count IV of the complaint (easement for ingress and egress), the circuit court granted defendants' motion in part and denied it in part, finding that plaintiff had an easement for ingress and egress arising out of the 1884 Plat in the property owned by defendant Eliot Street, i.e., Eliot Street between Woodward Avenue and John R. The circuit court otherwise denied all plaintiff's other claims under Count IV without explanation, thereby implicitly rejecting plaintiff's claim that the Development Agreement was an express easement that granted it ingress and egress over Eliot Street.

- The circuit court granted defendants' motion with respect to Count V of the complaint (easement for parking), thereby denying plaintiff's claim that it had an easement for parking. The court did not specifically address plaintiff's theories that parking rights arose by virtue of the 1884 Plat or by the alleged express easement of the Development Agreement, but the implication of the circuit court's blanket ruling was that no easement rights arose out of either.

- Regarding Count III of the counterclaim, the circuit court granted the motion in part and denied it in part. In particular, the circuit court ruled that defendant SEC, which only owned lots in the 1871 Plat, and defendant Woodward Eliot, only to the extent it owned lots in the 1871 Plat, were not conferred any easement rights in the 1884 Plat as to those 1871 lots these defendants owned. The court also found that defendants Mack 22, Woodward Eliot, and Eliot Street, which owned property in the 1884 Plat, possessed an easement for ingress and egress over the disputed property by virtue of the 1884 Plat. Relatedly, the circuit court emphasized that the 1884 Plat did not confer plaintiff any other rights beyond ingress and egress.

Plaintiff appeals and defendant SEC cross-appeals the trial court's order.

## II. STANDARD OF REVIEW

This Court reviews de novo a circuit court's decision on a motion for summary disposition under MCR 2.116(C)(10). *Houston v Mint Group, LLC*, 335 Mich App 545, 557; 968 NW2d 9 (2021). A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999). A party is entitled to summary disposition under MCR 2.116(C)(10) if "there is no genuine issue as to any material fact, and the moving party is entitled to judgment . . . as a matter of law." *Morelli v City of Madison Hts*, 315 Mich App 699, 702; 890 NW2d 878 (2016). In reviewing a motion under this subrule, this Court considers all the substantively admissible evidence in a light most favorable to the nonmoving party. *Heydon v MediaOne of Southeast Mich, Inc*, 275 Mich App 267, 269; 739 NW2d 373 (2007); MCR 2.116(G)(6). "[T]he nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Detroit Edison Co v Stenman*, 311 Mich App 367, 377; 875 NW2d 767 (2015) (quotation marks and citation omitted).

Generally, the extent of an easement is a question of fact reviewed for clear error. *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005). "However, when reasonable minds could not disagree concerning [the scope and extent of an easement], they should be decided by the court on summary disposition as a matter of law." *Wiggins v City of Burton*, 291 Mich App 532, 550; 805 NW2d 517 (2011).

## III. ANALYSIS

## A. EXPRESS EASEMENT

Plaintiff first contends the trial court erred by implicitly concluding that the Development Agreement did not create an express easement for parking in favor of plaintiff. We disagree.

In the instant matter, plaintiff claims that the Development Agreement created an express easement for parking.[7] According to plaintiff, the Agreement characterized the Club's use of the Red Cross's property as a "right" and nothing in the Agreement indicated that the arrangement was to be temporary, meaning that the rights were to be perpetual; further, that the Agreement used terms such as "exclusive," "minimum," and a "right of ingress and egress," and the fact that the Development Agreement was submitted to the City Council and referenced in a recorded document, i.e., the Resolution, supports that the parties intended to create a permanent easement for parking.

"An easement is the right to use the land of another for a specified purpose." *Heydon*, 275 Mich App at 270 (quotation marks and citation omitted). "An easement does not displace the general possession of the land by its owner, but merely grants the holder of the easement qualified possession only to the extent necessary for enjoyment of the rights conferred by the easement." *Matthews v Dep't of Natural Resources*, 288 Mich App 23, 37; 792 NW2d 40 (2010) (quotation marks and citation omitted). In *Heydon*, 275 Mich App at 270, this Court explained that

> Michigan courts recognize two types of easements: easements appurtenant and easements in gross. *Collins v Stewart*, 302 Mich 1, 4; 4 NW2d 446 (1942). An appurtenant easement attaches to the land and is incapable of existence apart from the land to which it is annexed. *Schadewald* [*v Brule*, 225 Mich App 26,] 35[; 570 NW2d 788 (1997)]. An easement appurtenant is necessarily connected with the use or enjoyment of the benefited parcel and may pass with the benefited property when the property is transferred. *McClintic-Marshall Co v Ford Motor Co*, 254 Mich 305, 318; 236 NW 792 (1931).
>
> "An easement in gross is one 'benefiting a particular person and not a particular piece of land.' " *Dep't of Natural Resources v Carmody-Lahti Real Estate, Inc*, 472 Mich 359, 379, n 41; 699 NW2d 272 (2005), quoting Black's Law

---

[7] Plaintiff also argues that the Development Agreement granted it an express easement for ingress and egress. However, the discussion of plaintiff's argument is limited to an easement for parking because the circuit court ruled that plaintiff has an easement for ingress and egress over Eliot Street arising out of the 1884 Plat.

-9-

Dictionary (7th ed). An easement in gross is thus personal in nature. *Smith v Dennedy*, 224 Mich 378, 381; 194 NW 998 (1923).

"[A]n easement may be created by express grant, by reservation or exception, or by covenant or agreement." *Heydon*, 275 Mich App at 270 (quotation marks and citation omitted). Because an easement is an interest in land it must comply with the statute of frauds, i.e., it must be in writing. *Forge v Smith*, 458 Mich 198, 205; 580 NW2d 876 (1998); MCL 566.106; MCL 566.108. "In order to create an express easement, there must be language in the writing manifesting a clear intent to create a servitude." *Forge*, 458 Mich at 205. "It is not necessary that the party reserving the easement right use any particular words as long as the intent to claim an easement is apparent . . . ." *Chapdelaine v Sochocki*, 247 Mich App 167, 170; 635 NW2d 339 (2001). In particular, however, the

> 'intent to grant an easement . . . must be so manifest on the face of the instrument that no other construction can be placed on it. Thus, to create an easement by express grant, there must be a writing containing plain and direct language evincing the grantor's intent to create a right in the nature of an easement rather than a license.' [*Forge*, 458 Mich at 205 n 17, quoting 25 Am Jur 2d, Easements and Licenses, § 18, p 586.]

"Any ambiguities are resolved in favor of use of the land free of easements." *Id*.

Further, the rules applicable to interpreting contracts are generally applicable to construing the terms of an easement. *Wiggins*, 291 Mich App at 551. As this Court has explained,

> in ascertaining the scope and extent of an easement, it is necessary to determine the true intent of the parties at the time the easement was created. *Hasselbring v Koepke*, 263 Mich 466, 477-478; 248 NW 869 (1933). Courts should begin by examining the plain language of the easement, itself. . . . If the language of the easement is clear, "it is to be enforced as written and no further inquiry is permitted." *Id*. [*Wiggins*, 291 Mich App at 551 (some citations omitted).]

In this matter, the Development Agreement was in the form of a letter written by the Club that answered a list of questions the Red Cross raised. With respect to parking, the Red Cross asked, "11. Are special parking spaces required for [the] Prismatic care taker?" The Development Agreement provided the following response with respect to parking:

> 11. Parking for the caretaker will be needed, on an exclusive basis; two spaces should suffice. The most convenient would be the two spaces nearest Eliot on the north and nearest the west of the Property. By the same token we shall need the use of at least twenty spaces on Saturday nights from October 1st until June 1st the following year between the hours of seven P.M. and eleven P.M. We occasionally use the club on Sunday but because of your schedules we see no problem. Implicit in the use of parking space is the right of ingress and egress to it from Woodward and/or Mack for the benefit of all persons lawfully approaching or leaving the Property.

While it is not necessary to use any particular words to create an easement, the portion of the Agreement pertaining to parking does not use terms, such as "grant," "convey," "easement," "rights," or "permanent," that would so manifestly evidence an intent on its face to create a permanent interest in the realty. Instead, the Development Agreement requests that the Club "shall need the use" of twenty parking spots and suggests that "the most convenient [spaces for the caretaker] would be" on Eliot Street and "two spaces should suffice." That the language is framed as a request, and uses the conditional terms "should" and "would" that suggest something might not happen, indicate permissive use. Comparatively, in recognition of the permanent rights vested in the owner of Lot 17 as a parcel in the 1884 Plat, the Development Agreement refers to the "right of ingress and egress" to Woodard Avenue and Mack. Tellingly, the Agreement does not describe the use for parking in the same way, i.e., as a "right" for the use of certain land, but instead reflects the Club's request for permission to park. Because the terms the Development Agreement used with respect to parking were permissive, they negate any intent to create an express easement for parking, and are consistent with the Club's use of the Red Cross's parking areas as a licensee. See *Forge*, 458 Mich at 210 ("A license grants permission to be on the land of the licensor without granting any permanent interest in the realty.").

That is, the Development Agreement on its face lacks any indicia that the parties intended to grant the Club a permanent interest in certain property for parking and, thus, contains no clear intent to create an easement for parking. Instead, the Agreement is simply a contractual arrangement between the Club and the Red Cross for the permissive use of an unidentified parking lot and two parking spaces on Eliot Street.

On appeal, plaintiff relies on copious amounts of parol evidence to establish the existence of an express easement for parking under the Development Agreement, including, *inter alia*, testimony from a Red Cross employee, a letter and memorandum from a Club member who negotiated the Agreement, and actions the Red Cross took after entering into the Agreement. Yet, plaintiff cites no law that parol evidence may be used to establish the *existence* of an easement. Instead, plaintiff's reliance on *Chapdelaine*, 247 Mich App at 167, and *Greve v Caron*, 233 Mich 261; 206 NW 334 (1925), is unavailing. In both of those cases, the existence of an easement was not in question, only the scope of the easement was at issue. *Greve*, 233 Mich at 264-265 (recognizing an easement was created through a grant conveying property "together with the right of an alley in the rear" and scope could be determined by reference to the situation of the dominant and servient estates at the time of the easement's creation); *Chapdelaine*, 247 Mich App at 170-171 (indicating a clear intent to create an easement by reservation existed where a purchase agreement and counteroffer contained language reserving a right to a "minimum access easement"). In such instances, parol evidence—including circumstances of possession and ownership, the parties' relations and relationship to the property, as well as the negotiations involved—may be used to help in the determination of the easement's description. *Kahn-Reiss, Inc v Detroit & Northern S&L Ass'n*, 59 Mich App 1, 8-9; 228 NW2d 816 (1975), overruled in part on other grounds *Schmidt v Eger*, 94 Mich App 728, 734-735; 289 NW2d 851 (1980).

In this matter, however, the Development Agreement does not create an express easement; consequently, the rule that parol evidence may be used to establish the scope of an easement, and the caselaw that plaintiff cites, is inapplicable. Further, as defendants point out, use of parol evidence to create an express easement would violate the statute of frauds. In summary, no genuine

issue of material fact exists that the Development Agreement did not create an express easement for parking. And, the trial court did not err in granting summary disposition on this claim.

## B. PRESCRIPTIVE EASEMENT

Plaintiff next argues that the circuit court erred by granting summary disposition in favor of defendants on its claim for a prescriptive easement for parking.[8] We disagree.

Plaintiff explains that it need not establish that its (and the Club's) use of the Red Cross parking lot was "adverse" because the use was pursuant to the terms of an intended, but imperfectly created, easement, relying on *Mulcahy*, 276 Mich App at 702. According to plaintiff, the circuit court ignored this rule of law and the evidence related to it and instead found that plaintiff's (and the Club's) use of the Red Cross parking lot was not adverse.

"A prescriptive easement results from open, notorious, adverse, and continuous use of another's property for a period of 15 years." *Matthews*, 288 Mich App at 37. For purposes of a prescriptive easement, the term "adverse" is synonymous with "hostile use" and does not require declarations of adverse intent or ill will during the prescriptive period. *Mulcahy*, 276 Mich App at 702. Rather, "[a]dverse or hostile use is use that is inconsistent with the right of the owner, without permission asked or given, that would entitle the owner to a cause of action against the intruder for trespassing." *Id*. The use of another's property qualifies as adverse if made under a claim of right when no right exists. *Id*. "The plaintiff bears the burden to demonstrate entitlement to a prescriptive easement by clear and cogent evidence." *Matthews*, 288 Mich App at 37.

As noted, plaintiff argues that it established adverse use pursuant to the terms of an intended, but imperfectly created, servitude, i.e., the Development Agreement. Plaintiff is correct that, under Michigan law, the adverse use requirement can be fulfilled if the use was pursuant to an invalidly created servitude. Indeed, in *Cook v Grand River Hydroelectric Power Co*, 131 Mich App 821, 826; 346 NW2d 881 (1984), this Court recognized that "[i]f a claimant has obtained a conveyance of an easement which is ineffective, his use of the subservient estate, made on the assumption that the conveyance was legally effective, is adverse and not made in subordination to the owner of the burdened estate." Applying this principle, this Court determined that the defendant power company had prescriptive water flowage easements over the plaintiffs' properties, even if the enactment of the marketable record title act had invalidated the defendant's express water flowage easements. *Id*. at 826-827.

Turning to the instant matter, for reasons already explained, the Development Agreement is not an express easement because it does not clearly manifest an intent to create a servitude with respect to parking. As noted, the language of the Development Agreement is couched in terms requesting use of two parking spaces and the use of 20 spaces in the parking lot. These requests for permission demonstrate a permissive use and do not evidence an intent to create an interest in land and more likely intended to create a license. "If the agreement implied is for creation of a

---

[8] Again, plaintiff asserts that it also had a prescriptive easement for ingress and egress; however, because the circuit court ruled that plaintiff has an easement for ingress and egress over Eliot Street arising out of the 1884 Plat, this discussion is limited to parking.

license, the use cannot give rise to a servitude by prescription . . . ." 1 Restatement of Property, Servitudes, 3d, § 2.16, comment *d*, p 226. Consequently, because the Development Agreement on its face creates a license, the holding that adverse use for purposes of prescriptive easement may be satisfied by use pursuant to "an intended but imperfectly created servitude," *Cook*, 131 Mich App at 826, is inapplicable.

Plaintiff alternatively argues that the circuit court erred by dismissing its prescriptive easement claim for parking because a legal presumption existed that its use of parking was hostile because it used the parking lot for 25 years. Plaintiff relies on *Haab v Moorman*, 332 Mich 126, 144; 50 NW2d 856 (1952), and *Widmayer v Leonard*, 422 Mich 280, 289-290; 373 NW2d 538 (1985), which both recognized that, when use has occurred notoriously and openly for a quarter of a century or more, it is unnecessary for the plaintiff to show by positive testimony that the use was adverse. Rather, in this instance, the burden of producing evidence shifts to the defendant to establish that the plaintiff's use was permissive. *Widmater*, 422 Mich at 290.

We agree that plaintiff was entitled to the presumption because the Club's (and plaintiff's) use of the parking lot was for approximately 25 years. See *Widmayer*, 422 Mich at 289-290; *Haab*, 332 Mich at 144. However, a review of the record demonstrates that defendants satisfied their burden by bringing forth evidence that the use was permissive.[9] And further, in this regard and viewing the record evidence most favorably to plaintiff, there is no genuine issue of material fact that plaintiff's (and the Club's) use of the Red Cross's parking lot was permissive.

First, the Development Agreement itself reflects that plaintiff's predecessor requested access to parking on the Red Cross's property and the Red Cross expressly consented to this use absent any grant of a servitude. Club members then began using the Red Cross's parking lot consistent with this mutually agreed upon use, akin to a license. When the Red Cross vehicles were sometimes in spaces needed by Club members on Saturday nights, the Red Cross workers would move those vehicles upon the Club's request. Thus, it is undisputed that the parties mutually agreed upon a parking arrangement on the Red Cross's property and that the parties' actions were consistent with the terms of that arrangement, reflecting use with permission.

On appeal, plaintiff contends a question of fact exists whether its use was adverse, noting first the Red Cross's letter seeking the Club's support for its development. The statements of A. William Shafer, the Red Cross's senior principal officer, that plaintiff relies upon, provided:

Closing Eliot Street will be important to this design concept. It will permit the

---

[9] Plaintiff posits that when this legal presumption applies, the matter must be submitted to a jury citing *Haab*, *Widmayer*, and *Ward v Consol Rail Corp*, 472 Mich 77, 84; 693 NW2d 366 (2005). However, none of these cases make such a pronouncement.

-13-

building footprint which we require, and the associated parking.

* * *

> In the attached plan, we are able to retain the Prismatic Club within our project area, since the footprint it requires is small, and its parking requirements are mostly during the evening or on weekends when our parking lots are not full.

This letter, however, is largely irrelevant to the analysis because it was drafted well before the parties came to an agreement and the Club started using the parking lot. And even if it was relevant, it does not have much probative value because it cannot be reasonably inferred from the statements therein that the Red Cross was either granting or denying plaintiff permission to park in the lot.

Plaintiff also references numerous Club members who attested to their involvement in the negotiations with the Red Cross, indicating that the Club sought permanent parking. Further, they attested to their belief that their continued use of the parking lot was a matter of right and that the Development Agreement gave Club members a right to park in the Red Cross's lot. None of these assertions, however, creates a genuine issue of material fact whether the Club's use was hostile. A unilateral subjective belief in the minds of Club members regarding the meaning of the Development Agreement does not demonstrate a positive assertion of a hostile right with respect to the Red Cross's parking lot. Regardless of what Club members subjectively believed, the undisputed facts show that Red Cross consented to the use. In fact, a review of these affidavits reveals no allegations of specific factual instances in which Club members took particular acts that were inconsistent with the Red Cross's consent, acted under a claim of right that would subject them to an action for trespass, or otherwise undertook specific acts inconsistent with the Red Cross's rights as the owner of the parking lot. See *Mulcahy*, 276 Mich App at 702. Instead, the Club members' assertions that they acted under a right to parking that was hostile to the Red Cross are mere conclusory assertions that lack the necessary specific facts demonstrating instances of hostile use. See *Quinto*, 451 Mich at 362. As such, the affiants' allegations are insufficient to create a genuine question of fact.

In sum, while plaintiff was entitled to the presumption that it and the Club's use was adverse or hostile because the use was for a period of 25 years, defendants met their burden of producing evidence that the use was not adverse, but rather was permissive. In turn, plaintiff failed to bring forth evidence demonstrating a genuine issue of material fact that would preclude summary disposition. Thus, the circuit court did not err by dismissing plaintiff's claim for a prescriptive easement for parking.

## C. SCOPE OF THE EASEMENT

Plaintiff next posits that the trial court was correct in ruling that plaintiff has an easement arising out of the 1884 Plat to use Eliot Street. However, plaintiff asserts that the court erred by limiting the scope of that easement to include only ingress and egress, to the exclusion of the right to park. We agree.

Plaintiff submits that the Michigan Supreme Court has recognized that the use of a street includes uses other than surface travel, the beneficial use and enjoyment of an easement reasonably

-14-

includes parking, and parking on Eliot Street would not impose an unreasonable burden on the servient estate.

"The use of an easement must be confined strictly to the purposes for which it was granted or reserved." *Delaney v Pond*, 350 Mich 685, 687; 86 NW2d 816 (1957). Further, it is a fundamental principle underlying the use of all easements that the easement holder cannot unreasonably burden the servient estate. *Id*. In other words,

> [i]t is an established principle that the conveyance of an easement gives to the grantee all such rights as are incident or necessary to the reasonable and proper enjoyment of the easement. And the use exercised by the holders of the easement must be reasonably necessary and convenient to the proper enjoyment of the easement, with as little burden as possible to the fee owner of the land. [*Blackhawk Dev Corp*, 473 Mich at 41-42 (quotation marks and citations omitted).]

These principles direct a two-step inquiry to determine whether a use is within the scope of an easement: first, whether the proposed use (here, parking) is necessary for the easement holder's effective use of the easement; and second, whether that use unreasonably burdens the servient estate. *Id*. at 42. Typically, the answers to these inquiries begins with the language of the grant. *Id*.

In this matter, the covenant deed conveyed plaintiff title to "Lot 17 and the adjacent l/2 of vacated Eliot Street, and adjacent 1/2 of vacated alley, Block 10, Brush's Subdivision, City of Detroit, Wayne County, Michigan, *as recorded in Liber 8 of Plats* [i.e., the 1884 Plat] . . . ." The parties do not dispute that "a purchaser of property in a recorded plat receives not only the interest as described in the deed but also whatever rights are indicated in the plat." *Nelson v Roscommon Co Rd Comm*, 117 Mich App 125, 132; 323 NW2d 621 (1982). In particular, a grantee of property in a platted subdivision acquires a private right " 'entitling the grantees to the use of the streets and ways laid down on the plat or referred to in the conveyance.' " *Rindone v Corey Community Church*, 335 Mich 311, 316-317; 55 NW2d 844 (1952), quoting *Pulcifer v Bishop*, 246 Mich 579, 583; 225 NW 3 (1929). This private right is separate and apart from rights a plat may grant to the public through a dedication; thus, even if a public dedication is vacated, as in the instant case, the lot owners retain a right to use the streets in the subdivision. *Minerva Partners, Ltd v First Passage, LLC*, 274 Mich App 207, 219; 731 NW2d 472 (2007). Consequently, under the warranty deed in this case, plaintiff acquired a private right entitling it "to the use of the streets and ways laid down on the plat," regardless of the fact that the public dedication of Eliot Street had been vacated by Resolution.[10] See *Rindone*, 335 Mich at 316-317.

---

[10] Defendants assert that plaintiff's private rights arising out of the 1884 Plat are also limited by the Resolution, but they cite no law and instead rely on the Resolution itself. In particular, defendants cite a portion of the Resolution requiring approval of the City Engineering Department before any buildings or structures may be placed upon the easement. Plaintiff's argument, however, is that the circuit court too narrowly construed their easement to exclude parking, not that the court wrongly excluded from the scope of the easement the construction of structures. The

The first question, thus, becomes whether parking is a use of the streets and ways laid down on the plat that is necessary to plaintiff's enjoyment of the easement. The trial court, without explanation, ruled that plaintiff's use of the streets was limited to ingress and egress. Plaintiff relies on both *Cleveland* and *Eyde Bros Dev Co*, both of which considered the scope of highway easements for public use and recognized that "use" of the roadways includes activities other than surface travel.

In *Cleveland*, 324 Mich at 529, 537, for example, the Court held that subsurface parking was a valid use of the public's easement for use of a public highway, despite that the plaintiff owned fee title to five feet of the boulevard. In support, the *Cleveland* Court relied on *In re Widening of Fulton Street*, 248 Mich 13; 226 NW 690 (1929), which recognized that surface parking is a lawful and long-recognized use of a public highway "since the day of the oxcart" that is subject to the state's police power to regulate it.[11] Similarly, in *Eyde Bros Dev Co*, 427 Mich at 286, the Court held that the construction of a subsurface sewer within a highway dedicated by user[12] was a proper public use of the easement.

Importantly, the rational underpinning the holdings in both of these cases was that public necessity justified use of the public easement as the wants and convenience of the public may render them necessary. That rationale does not apply in this matter, given that this case involves an individual's private right to use of the streets in a platted subdivision; under these circumstances, it could hardly be said that an individual's right includes uses such as construction of a large parking structure or installation of utilities because that use would unduly burden the servient estate and other easement holder's rights in the same property. Nonetheless, *Cleveland* and *Eyde*

---

Resolution, thus, is not relevant to the present inquiry because it does not address a right to temporarily park vehicles within the bounds of the easement.

[11] The quoted passage from *Fulton Street*, 248 Mich at 17, provides in relevant part:

> From the day of the oxcart there have been maintained in the public highways hitching posts and rails by which provision was made for the leaving of animal-drawn vehicles at proper places on public thoroughfares. The demand of our motor age has greatly increased the necessity for space in the public streets for leaving vehicles. This right is of importance to the tradesmen along the street as well as to the traveler thereon. One would hardly have the temerity to question that such a use is a lawful use of the highway. Its regulation is a matter for the exercise of police power, with which, in the absence of abuse, courts should not interfere. In the future, this space which the city seeks to add to Fulton street may or may not be used for parking. The land was taken "for street purposes." But parking is a proper use of the highway, and if necessity therefor exists, the right of eminent domain may be exercised to establish or widen highways adequate for this purpose. The taking of the land for highways is not limited to that necessary for actual travel.

[12] A highway dedicated by user occurs when the public uses the highway for a period of years without objection by the owner. *Eyde Bros Dev Co*, 427 Mich at 281 n 4.

*Bros Dev Co* remain persuasive for the point that "use" of a road includes more than ingress and egress.

Given the foregoing, we conclude that temporary parking is not inconsistent with a plat's grant of a private right for the use of a street. Parking is generally understood to be a common use of a street or road when the easement is of sufficient width to allow parking and unless specifically prohibited. Thus, when a grantor decides to create an easement for use of a street that is 60 feet in width, as in this case, it is reasonable to assume that the grantor intended to allow for all appropriate purposes to which roads and streets are actually devoted, including temporary on-street parking, so long as the exercise of that right does not unduly burden the rights of the servient estate.[13] Accordingly, the trial court erred by concluding that plaintiff's rights under the 1884 Plat for use of the street were limited to ingress and egress; rather, plaintiff is entitled to use of Eliot Street for temporary on-street parking consistent with its beneficial and reasonable enjoyment of the grant that does not unreasonably interfere with the rights of the servient estate (defendant Eliot Street) and provided such use is not contrary to the city's police powers.

## D. PARTIES' RIGHTS TO THE EASEMENT

Plaintiff next argues that the trial court erred by finding that defendant Eliot Street has easement rights to the portion of Eliot Street abutting plaintiff's lot, i.e., the disputed property. According to plaintiff, because defendant Eliot Street does not own any property within the 1884 Plat that is a dominant estate with respect to Eliot Street, it cannot have an easement over the disputed property. We disagree.

As stated in *Kirchen v Remenga*, 291 Mich 94, 108; 288 NW 344 (1939):

> The purchasers of lots in [an] original plat took not only the interest of the grantor in the land described in their respective deeds, but, as an incorporeal hereditament . . . appurtenant to it, took an easement in the streets, parks and public grounds mentioned and designated in the plat as an implied covenant that subsequent purchasers should be entitled to the same rights. [Citation omitted.]

"The land served or benefited by an appurtenant easement is called the dominant tenement. The land burdened by an appurtenant easement is called the servient tenement." *Schadewald*, 225 Mich App at 36. "[A]n easement appurtenant to an estate is so to every part thereof, whatever the subdivision at the time or subsequently." *Barbaresos v Casaszar*, 325 Mich 1, 8; 37 NW2d 689 (1949). "An appurtenant easement . . . attaches to the land and is incapable of existence separate and apart from the particular land to which it is annexed." *Schadewald*, 225 Mich App at 35.

---

[13] Defendants' argument seems to suggest that plaintiff will build a parking structure in the street to accommodate 22 cars, but then notes that plaintiff has not submitted any development plans. Plaintiff has made no such assertion on appeal and there is no indication that plaintiff will use the street for parking in a manner that will unduly burden the rights of the servient estate or other easement owners.

Thus, in this matter, each of the lots in the 1884 Plat at the time of the platting was a dominant estate holding an appurtenant easement for use of all of the streets in the plat.

However, in 1994, the portion of Eliot Street between Woodward and John R dedicated to the public was vacated pursuant to the Resolution. When a public dedication is vacated, as in the instant case, the lot owners retain a private right to use of the streets in the platted subdivision. *Minerva Partners*, 274 Mich App at 219. Further, "upon the vacation of a street or alley the land reverts to the abutting owner or owners." *Valoppi v Detroit Engineering & Machine Co*, 339 Mich 674, 677; 64 NW2d 884 (1954) (quotation marks and citation omitted); MCL 560.227a(2).[14] In effect, the reversion of the portion of a street to abutting lot owners does not create a separate parcel, but instead expands each abutting lot. *Id.* Additionally, when a dominant estate (the lots) and the servient estate (the abutting portions of Eliot Street) are joined by vesting title in the same owner, the easement appurtenant is extinguished as the portion of the servient estate that reverted to the dominant estate. *von Meding v Strahl*, 319 Mich 598, 605; 30 NW2d 363 (1948), overruled in part on other grounds by *Harrison v Heald*, 360 Mich 203; 103 NW2d 348 (1960).

Examining the instant facts, when defendants Mack 22 and Woodward Eliot[15] acquired their lots in the 1884 Plat, they also took title to the ½ portion of Eliot Street abutting each lot purchased because the street had been vacated by the Resolution. MCL 560.227a(2). Because the portions of vacated Eliot Street had reverted to the abutting lot owners (previously the Red Cross), the metes and bounds of these lots were described to include the adjacent portions of Eliot Street. See *Valoppi*, 339 Mich at 677. As lots in a platted subdivision, these expanded lots possessed an easement appurtenant to use the streets shown on the plat. See *Kirchen*, 291 Mich at 108; *Minerva Partners*, 274 Mich App at 219. Thus, when defendants split the lots and conveyed the portions of their lots comprised of Eliot Street to defendant Eliot Street, the conveyance transferred the easement appurtenant still attached to those lots by virtue of the vacation of Eliot Street and reversion of that property to individual lots. See *Walker v Bennett*, 111 Mich App 40, 44; 315 NW2d 142 (1981) ("It is the general rule that if a dominant estate is divided, an appurtenant right of way is not destroyed and that any owner or assignee may claim the easement so far as it is applicable to his parcel provided that such division can be accomplished without additional burden on the servient tenant."). In other words, when defendants transferred their interests in the portions of Eliot Street to defendant Eliot Street, they conveyed the easement appurtenant attached to that property, which includes use of the streets in the 1884 Plat not owned by defendant Eliot Street, to include the portion of Eliot Street abutting plaintiff's property (the disputed property).

---

[14] This section provides:

> If the lots abutting the vacated street or alley on both sides belong to the same proprietor, title to the vacated street or alley shall vest in that proprietor. If the lots on opposite sides of the vacated street or alley belong to different proprietors, title up to the center line of the vacated street or alley shall vest in the respective proprietors of the abutting lots on each side. [MCL 560.227a(2).]

[15] Recall, defendant SEC does not own any lots in the 1884 Plat and defendant Woodward Eliot owns some lots in the 1884 Plat and some in the 1871 Plat.

-18-

Consequently, the trial court did not err by determining that defendant Eliot Street held an easement over the disputed property.

The circuit court did not err by granting summary disposition in part in favor of defendants under Count III of their counterclaim, by ruling that defendants Mack 22, Eliot Street, and Woodward Eliot possess an easement for ingress and egress over the disputed property.

### E. EASEMENT RIGHTS FOLLOWING ABANDONMENT

Plaintiff next argues that the circuit court erred by ruling that defendants Mack 22, Woodward Eliot, and Eliot Street each hold an easement over the disputed property given that the easement was extinguished by abandonment. In support, plaintiff contends substantial evidence exists from which a jury could infer that the easement for "vehicular traffic" was abandoned, including that the street was vacated and the paving was removed, the Red Cross did not use the portion of the street in front of the Club, and numerous structures were erected preventing the use of the street. We disagree.

"Abandonment is largely a matter of intention. It consists of intention and nonuser." *Goodman v Brenner*, 219 Mich 55, 60; 188 NW 377 (1922). Nonuser must be coupled with "some clear and decisive act of the dominant owner, showing an intention to abandon and release his right" *id*., as well as acts that "destroy the object for which the easement was created or the means of its enjoyment," *Carmody-Lahti Real Estate, Inc*, 472 Mich at 385. Mere nonuse alone does not establish abandonment. *Choals v Plummer*, 353 Mich 64, 72; 90 NW2d 851 (1958).

In the instant matter, nothing in the record shows that the Red Cross intended to abandon the use of the street over the disputed property or that it undertook any acts that destroyed the purpose of the easement with respect to the disputed property. After Eliot Street was vacated in 1994, the Red Cross continued to use the disputed area "quite often" for vehicular traffic. Initially, the Red Cross removed the original paved street in front of plaintiff's property, but there is no dispute that the Red Cross installed a paved area that it (and Club members) regularly used for purposes of vehicular ingress and egress consistent with the purpose of the private right granted by the plat for use of the street. Use of the disputed property in this manner occurred despite the modifications the Red Cross made to the area, including installation of a curb cut, a line of shrubbery, and a tree in a cement well.

Further, while the Red Cross did seek and obtain a resolution to vacate Eliot Street, this fact alone does not evidence an intent to abandon the easement for use of a street over the disputed property.[16] This is because the Red Cross not only continued to use this property for ingress and

---

[16] To the extent plaintiff suggests that the vacation of a street operates as an abandonment of an easement conferred by a plat, that proposition is without support in the law. After Eliot Street was vacated, the Red Cross and the University of Michigan (and later plaintiff) retained a private right under the plat for the use of the streets. Moreover, while the request to vacate may be relevant when coupled with other evidence showing an intent to abandon an easement, such other evidence is lacking in this case. See *Carmody-Lahti Real Estate, Inc*, 472 Mich at 385-386 (stating that

egress, but also because the Red Cross made improvements that did not impede the property's use for ingress and egress and did not place any improvement or make changes to the disputed property that would make such use impossible. In fact, longtime Club member Peter Durand admitted that "at no time since I became a member [in 2001] did the Red Cross ever erect a fence or other barrier to prevent club members, their guests, vendors, contractors or other persons from using the Disputed Area in the course of entering or leaving clubhouse or making deliveries." In this regard, the physical structures that prevented ingress and egress, such as a garage, a security tower, a parking lot, and barriers at the west end of the parking lot, which plaintiff references as evidence of abandonment, are not relevant because these structures were not erected on the disputed property. In short, there is no evidence of an intent to abandon the easement over the disputed property. Accordingly, plaintiff has failed to demonstrate a genuine issue of material fact regarding whether the Red Cross abandoned the easement for use of the street over the disputed property.

## F. ATTORNEY FEES

Finally, plaintiff submits that the trial court erred by failing to award plaintiff attorney fees and costs related to its action to quiet title in the disputed property. Because defendants put a cloud on title to that property by filing a wild deed knowing that plaintiff owned that property, plaintiff asserts that damages were proper under MCL 565.108. We disagree.

The statutory provision, MCL 565.108, referred to as "the statutory slander of title statute," provides:

> *No person shall use the privilege of filing notices hereunder for the purpose of slandering the title to land*, and in any action brought for the purpose of quieting title to land, *if the court shall find that any person has filed a claim for that reason only*, he shall award the plaintiff all the costs of such action, including such attorney fees as the court may allow to the plaintiff, and in addition, shall decree that the defendant asserting such claim shall pay to plaintiff all damages that plaintiff may have sustained as the result of such notice of claim having been so filed for record. [Emphasis added.]

"To establish slander of title at common law, a plaintiff must show falsity, malice, and special damages, i.e., that the defendant maliciously published false statements that disparaged a plaintiff's right in property, causing special damages." *B & B Investment Group v Gitler*, 229 Mich App 1, 8; 581 NW2d 17 (1998). "The same three elements are required in slander of title actions brought under MCL 565.108." *Id.*

Under the statute, an award of special damages is only allowed if the court finds "that any person has filed a claim for [the purpose of slandering the title to land]." MCL 565.108. The statute thus contemplates a finding by a trial court that a defendant has committed either common-law or statutory slander of title. By logical inference, the statute only applies when a plaintiff has

---

intent to abandon cannot be inferred from request to abandon an easement, unless coupled with acts consistent with that intent).

raised a common-law or statutory slander of title claim and a trial court has made the requisite findings to support such a claim.

In this matter, plaintiff neither pleaded nor amended the complaint to include either a statutory or common-law slander of title claim. Rather, it appears that plaintiff presumes that an action to quiet title is sufficient for application of MCL 565.108. Plaintiff, however, cites no law that an award of attorney fees and costs under that the slander of title statute applies in the absence of a pleaded and established slander of title claim or that only a quiet-title action can form the basis for applying MCL 565.108. Further, to allow special damages under MCL 5655.108 solely on the basis of an established quiet-title claim would contravene the statute's plain language: The statute requires a finding of slander of title and no such finding has been made in this case. Accordingly, we reject plaintiff's claim that it is entitled to attorney's fees and costs under MCL 565.108.

## G. CROSS-APPEAL

On cross-appeal, defendants argue that the circuit court erred by determining that plaintiff has easement rights to the portion of Eliot Street dedicated on the 1871 Plat, despite that plaintiff's property is platted on the 1884 Plat, whereas defendant SEC, which owns lots in the 1871 Plat only, did not have any easement rights to the portion of Eliot Street depicted on the 1884 Plat.

Defendants did not raise the argument related to reciprocal rights in the circuit court. This argument, therefore, is waived and we do not consider it. *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, ___ Mich App ___, ___; ___NW2d___ (2023) (Docket No. 359090); slip op at 2-5 (indicating that, in a civil case, unpreserved claims of error are waived). Further, defendants conceded in the circuit court that defendant SEC had no easement rights arising from the 1884 Plat. Additionally, defendants took the position that the 1884 Plat did not incorporate the 1871 Plat. Thus, to the extent that defendants argue on appeal that the 1884 Plat incorporates the 1871 Plat and grants defendant SEC easement rights to all of Eliot Street, that argument is inconsistent with defendants' argument in the circuit court and, thus, is not properly before this Court. "A party may not take a position in the trial court and subsequently seek redress in an appellate court that is based on a position contrary to that taken in the trial court." *Living Alternatives for Developmentally Disabled Inc v Dep't of Mental Health*, 207 Mich App 482, 484; 525 NW2d 466 (1994). Accordingly, we decline to grant defendants appellate relief through their cross-appeal.

Affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Anica Letica
/s/ Christopher M. Murray
/s/ Sima G. Patel